**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION**

| | | |
|---|---|---|
| PAM WHEELER, | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLETTIS MCDANIEL, in his official | ) | |
| capacities as Director of Bledsoe County | ) | |
| Schools; and TOMMY NIPPER, in his | ) | |
| official capacities as Principal of | ) | |
| Bledsoe County High School; and | ) | |
| SUZANNE BOYNTON, in her official | ) | Case No. 1:08-CV-56 |
| capacities as Assistant Principal of Bledsoe | ) | Chief Judge Curtis L. Collier |
| County High School; and LINDA NIPPER, | ) | |
| in her official capacities as Assistant Principal | ) | |
| of Bledsoe County High School; and | ) | |
| RHONDA CAGLE, in her official | ) | |
| capacities as Assistant Principal of Bledsoe | ) | |
| County High School, | ) | |
| | ) | |
|       Defendants. | ) | |

## MEMORANDUM

     Before the Court is a motion to dismiss under Fed. R. Civ. P. 12(b)(6) by Defendants Clettis

McDaniel, Tommy Nipper, Suzanne Boynton, Linda Nipper, and Rhonda Cagle (Court File No. 14).

Plaintiff Pam Wheeler timely responded to the motion (Court File No. 16) and Defendants timely

replied (Court File No. 18).  For the following reasons, the Court will **GRANT IN PART** and

**DENY IN PART** Defendants' motion to dismiss.

## I.    RELEVANT FACTS[1]

---

    [1]This statement of facts relies on the factual allegations in Plaintiff's complaint (Court File
No.1).  In evaluating a motion to dismiss, the Court must accept the complaint's factual allegations

Plaintiff was a teacher with Bledsoe County Schools (the "School System") in Bledsoe County, Tennessee; she worked at Bledsoe County High School ("High School") beginning in 2004 (Compl. ¶¶ 1, 12). She claims she was not observed or evaluated during the 2004–2005 or 2005–2006 school years, as required by Tennessee law (*Id.* ¶¶ 13, 14).[2] She also claims in the spring of 2006, she was approached by a group of students at the High School who asked if Plaintiff would act as a sponsor for a newly created "Young Republicans" club. Each student organization at the High School was required to have a teacher act as sponsor; the club could then use the teacher's classroom as a meeting place and have the teacher supervise the club's meetings (*Id.* ¶ 15).

Plaintiff alleges shortly after she agreed to sponsor the Young Republicans, she was called into the office of Defendant Tommy Nipper, the principal of the High School,[3] where she was "verbally assailed" for associating with individuals who wanted to bring politics into the school. She says Nipper told her "there will be no Republican politics in this school" (*Id.* ¶ 16). She filed a complaint with Defendant McDaniel—the School System's director—alleging Nipper was verbally abusive and sought to bully and physically intimidate her. She is unaware of any action

---

as true. *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir. 1994).

[2]The laws governing Tennessee public education are set forth in Title 49 of the Tennessee Code Annotated. The Tennessee State Board of Education has promulgated rules governing evaluations of teachers. The most relevant rule states "[e]valuations of 1st and 2nd year apprentice teachers require at least three observation cycles." Tenn. Comp. R. & Regs. 0520-2-1-.02(1)(b)(5)(iii) (2008). A teacher in Tennessee must serve at least three years as a "probationary teacher" before acquiring tenure status. Tenn. Code Ann. § 49-5-504(a). To attain "permanent tenure" or "limited tenure" status, a teacher must gain reemployment by the local school board after completing the probationary period. *Id.* § 49-5-503. A teacher is not entitled to permanent tenure status as a matter of right upon completion of the probationary period unless retained or reelected to the position. *State ex rel. Stewart v. Lunsford*, 336 S.W.2d 20 (Tenn. 1960). It seems undisputed that during the time Plaintiff taught at the High School, she did not have tenure.

[3]Unless otherwise noted, all subsequent references to Defendant Nipper refer to Tommy Nipper.

having been taken on the complaint (*Id.* ¶¶ 18–19).

During the 2006–2007 school year, Plaintiff was twice observed and evaluated by Defendant Cagle, an assistant principal at the High School. While Cagle advised Plaintiff in one review to "build in workable time to collaborate with colleagues and ensure student integration," Cagle's reviews of Plaintiff were otherwise positive, indicating she "adequately applies the state performance indicators," "chooses appropriate standards," and "demonstrates a deep understanding of concepts and critical thinking appropriate to grade levels" (*Id.* ¶¶ 20–21). Moreover, Nipper also evaluated Plaintiff on March 30, 2007, and indicated she was proficient or advanced in all relevant categories except for "Performs professional responsibilities efficiently and effectively." There, he wrote that Plaintiff "[d]oes not engage in dialogue with administrator respectfully." With the exception of this comment, the summative evaluation Nipper made of Plaintiff was marked Satisfactory (*Id.* ¶ 23).[4]

On April 9, 2007, Plaintiff received a letter from Defendant McDaniel, stating her "contract with Bledsoe County Schools will not be renewed for the 2007-08 school year" (*Id.* Ex. A). Plaintiff alleges that the School System ignored state laws concerning teacher evaluations, and instead created its own informal system of teacher hiring. This included (1) "rehiring some teachers year after year past the initial three years and never granting them tenure" and (2) "rehiring some teachers for at least one year, with no set probationary period or distinguishable policy in order to allow Bledsoe County School System time to have them evaluated before granting them tenure" (*Id.* ¶¶

---

[4]Plaintiff wrote a "Rebuttal Statement" to Nipper's report (Compl. Ex. G) in which she accused him of bias by alleging one incident against her without notice to her, ignoring Cagle's two evaluations that year, and ignoring her three years with the Bledsoe County School System (*Id.* ¶ 25).

3

26–27). Additionally, Plaintiff claims "more than one teacher was granted tenure having never been evaluated by Bledsoe County School System" (*Id.*. ¶ 28). According to Plaintiff, though she went unevaluated during her first two years as a teacher at the High School, she was not afforded the same benefits of this informal system that other non-tenured teachers enjoyed. She claims she is unaware of any state administrative remedies which could afford her redress (*Id.* ¶ 10).

## II.    STANDARD OF REVIEW

When reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998), accept the complaint's factual allegations as true, *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 996 (6th Cir. 1994), and determine whether the plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). In deciding a motion to dismiss, the question is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support her claims. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). At the same time, bare assertions of legal conclusions are insufficient, and the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Unsupported allegations and legal conclusions "masquerading as factual conclusions" are insufficient to prevent a motion to dismiss. *Id.*

## III.    DISCUSSION

Plaintiff brings claims under the United States Constitution using 42 U.S.C. § 1983 as her

4

cause of action. She alleges Fifth and Fourteenth Amendment violations in that she was denied procedural due process and was not given equal protection of the laws, and a First Amendment violation for Nipper's intimidation and threats in retaliation for her supporting the Young Republicans club (Compl. ¶¶ 29–36). Defendant responds by arguing Plaintiff does not state claims on which this Court can grant relief, and by contesting this Court's jurisdiction to hear the claims because, according to Defendant, they are based entirely in state law (Court File Nos. 14–15).

### A. Jurisdiction

Defendants argue this Court lacks subject matter jurisdiction to hear Plaintiff's complaint. Because Plaintiff makes claims regarding the system of teachers' employment within the Bledsoe County School System, and that School System has in place a tenure system governed by Tennessee law, Defendants argue there are no federal constitutional claims which create federal jurisdiction over the complaint.

Federal courts are tribunals of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A federal court may exercise original jurisdiction over a claim arising under the Constitution, laws, or treaties of the United States, 28 U.S.C. § 1331, or a claim involving diversity of citizenship where the amount in controversy exceeds $75,000, *id.* § 1332. A federal court must dismiss a complaint whenever it lacks subject matter jurisdiction, and any federal court may question the existence of subject matter jurisdiction at any time. *See, e.g.*, *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 154 (1908) (instructing the circuit court to dismiss the suit for lack of subject-matter jurisdiction).

State law may give rise to a protected due process interest, but a federal constitutional analysis is employed to determine whether the interest was deprived fairly or arbitrarily. *Cleveland*

5

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process is conferred, not by legislative grace, but by constitutional guarantee.") (internal quotation omitted); *Black v. Parke*, 4 F.3d 442, 447 (6th Cir. 1993) ("[T]he procedural due process required before one may be deprived of a liberty interest is governed by federal constitutional law and not state law."). These two cases make clear that though state law may provide the contours of what process is due, the existence of the right to due process itself, and the resulting inquiry concerning whether that process was fairly afforded, is a question of federal constitutional law which a federal court may hear as part of its original jurisdiction. Furthermore, colorable claims brought under 42 U.S.C. § 1983 for deprivations of federal constitutional rights also fall within a federal court's original jurisdiction by statutory authorization. 28 U.S.C. § 1343(a) ("The district court shall have original jurisdiction of any civil action . . . [t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . .").[5]

The same is true for First Amendment claims. Claims for violations of rights secured by the First Amendment, by definition, arise out of the Constitution of the United States. The cause of action under which to bring such claims is contained in 42 U.S.C. § 1983. Federal courts undoubtedly have jurisdiction to entertain claims of First Amendment violations.

In this case, Plaintiff has brought facially plausible claims for deprivations of constitutional rights under 42 U.S.C. § 1983. Whether these claims are meritorious or not (and should survive or

---

[5]Though 28 U.S.C. § 1343 remains valid law, its grant of jurisdiction in civil rights actions was rendered somewhat superfluous, in 1980, with the elimination of the amount in controversy requirement in 28 U.S.C. § 1331.

6

be dismissed) is a separate question, and one the Court addresses in the following sections. But for jurisdictional purposes, Plaintiff has alleged a deprivation of a procedural due process interest, equal protection violations, and violations of her First Amendment rights. These are claims grounded in the federal Constitution and are of the type which, as the foregoing law makes clear, this Court has original jurisdiction to entertain. Accordingly, the Court will not dismiss Plaintiff's claims for want of jurisdiction alone.

### B. Procedural Due Process

Plaintiff claims her Fourteenth Amendment rights to procedural due process were violated in that Defendants (1) failed to investigate her complaint about Nipper's verbal abuse and physical intimidation, (2) failed to evaluate her during her first two years of teaching at the high school, and (3) did not follow state education laws and school board regulations on evaluation and hiring of teachers. She also states a procedural due process violation for Nipper's use of his March 30, 2007 report as a tool to discredit Plaintiff and refuse to recommend her for tenure (Compl. ¶¶ 30–36). She contends the school created a "protected interest" by informally rehiring teachers year after year without granting them tenure, thus creating, essentially, a never-ending probationary term, contrary to Tennessee education law (Court File No. 17).

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. It is thus fundamental that a deprivation of life, liberty, or property is a prerequisite to compel the government to provide due process. To move forward on this claim, Plaintiff must state a recognized property or liberty interest on which Tennessee impinged without first affording her due process.

"To have a property interest in a benefit, a person clearly must have more than an abstract

need or desire for it. . . .  He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*  In a case addressing a non-tenured university professor's right to review his failure to be reappointed for the upcoming school year, the *Roth* Court held the professor's property interest was "created and defined by the terms of his appointment," which made no provision for renewal. *Id.* at 578.  The professor thus possessed no property interest in re-employment, and university authorities were not required to afford him a hearing when they did not renew his contract. *Id.*

The Sixth Circuit has held similarly.  "[A] non-tenured teacher has no 'expectancy' of continued employment, whatever may be the policies of the institution, where there exists a statutory tenure system." *Ryan v. Aurora City Bd. of Educ.*, 540 F.2d 222, 227 (6th Cir. 1976).  The court held the existence of a statutory tenure system negated any possible expectation of continued employment even "where 'the policies and practices of the institution' rise to the level of implied tenure." *Id.* (quoting *Perry v. Sindermann*, 408 U.S. 593, 603 (1972)).  The *Ryan* court added that "the sufficiency of a claim of entitlement to a property interest in employment must be decided by a reference to state law even if the entitlement is based on an implied contract theory." *Id.* at 228 (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976)).

The holding in *Yashon v. Gregory*, 737 F.2d 547 (6th Cir. 1984), is not to the contrary. There, the Sixth Circuit held the plaintiff physician could survive summary judgment on his due process claim because no formal tenure system was in effect at the state university hospital system

8

where he worked. *Id.* at 554. The court did note, however, that "[m]any courts, including this court, have held that the presence of a formal tenure system precludes reliance upon *de facto* understandings because one purpose of erecting a tenure system is to avoid the latter type of claim." *Id.* (citing *Ryan*, 540 F.2d at 227). The Sixth Circuit distinguished Yashon's case because there was a long-standing pattern of de facto reappointments to the medical staff without any reliance on a formal tenure system, so the plaintiff was entitled to rely on any informal, mutual understandings he had with the hospitals. *Id.*

In the instant case, Tennessee has created a formal statutory system governing the award of tenure to public school teachers: the Tennessee Teacher Tenure Act. *See* Tenn. Code Ann. §§ 49-5-501 to -515. This Act governs, among other matters, types of tenure, probation status, dismissal or suspension of teachers, and procedures for judicial review. It also authorizes local school boards to promulgate standards beyond those required by the state board of education. *Id.* § 49-5-506. While a right to judicial review exists under the Act, *id.* § 49-5-513, such judicial review is unavailable for a board's decision not to re-employ an untenured teacher, *Shannon v. Bd. of Educ.*, 286 S.W.2d 571 (Tenn. 1955); *see also Pennycuff v. Fentress County Bd. of Educ.*, 404 F.3d 447 (6th Cir. 2005) (upholding the district court's determination that plaintiff principal had not attained tenure and thus concluding he had no due process entitlement to notice and a hearing).

Though this Court explained earlier that the existence of procedural due process generally is a federal constitutional right, *see* Part III.A., the definition and contours of the due process right are given by "an independent source such as state law," *Roth*, 408 U.S. at 577. The Tennessee legislature, in enacting the Teacher Tenure Act, chose to extend more extensive procedural due process protections to some educators (tenured teachers) but not others (those without tenure). That

9

is, the fact of the statutory tenure system's existence could not have given Plaintiff an expectation of continued employment, notwithstanding any informal system of promotion without evaluation she has alleged. *Ryan*, 540 F.2d at 227. Even if Plaintiff or her coteachers had informal understandings with the high school or School Board that teachers could be promoted without first going through the tenure process, they were not entitled to rely on those understandings, because the Teacher Tenure Act exists precisely to preclude those types of claims. *See Yashon*, 737 F.2d at 554. If Plaintiff was not entitled to an expectation of the benefit of continued employment, *Perry*, 408 U.S. at 601, she lacked a benefit provided by state law which could be construed as a property interest. As such, she has failed to make out the first, necessary element for a claim of a procedural due process violation.

The Court must then consider whether, even though Plaintiff lacked a property interest in continued employment with the School Board, she nevertheless possessed "a liberty interest in not being denied employment for exercising her First Amendment right to freedom of association." *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955 (6th Cir. 1993). In *Adkins*, an untenured school secretary's contract was unrenewed for the following year because she supported her husband, the principal of the school, in his disagreement with the school system's superintendent. The plaintiff sued, claiming a violation of her right to freedom of association because the adverse employment action essentially forced her to choose between her job and her marriage. The Sixth Circuit agreed, stating that "it is not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment." *Id.* at 956. Put another way, "a person's involvement in activity shielded by the constitutionally protected rights of privacy and liberty constitutes an impermissible reason for denying employment." *Id.* at 955 (quoting *Littlejohn*

10

*v. Rose*, 768 F.2d 765, 769–70 (6th Cir. 1985)).  The court held that because the school board intruded into the plaintiff's marriage relationship by firing her for supporting her husband, the plaintiff had demonstrated a prima facie case of a constitutional violation by being denied her liberty interest.  *Id.* at 956.

The instant case is distinguishable from the facts of *Adkins*.  Plaintiff here is not claiming her freedom of association lies in marriage—one of the "intimate human relationships" protected by the Supreme Court against state intrusion.  *Id.*  Rather, any liberty interest in not being denied employment for exercising her freedom to associate would arise from Plaintiff's advising the Young Republicans club.  While the club may provide a forum for interested students to advocate for political positions which hold deep meaning for them, association with such a club does not rise to the level of the intimate human relationships a liberty interest is meant to protect.  Hence, Plaintiff also lacks a cognizable liberty interest in not being denied employment for purposes of procedural due process analysis.[6]

The second step in procedural due process analysis is to determine the amount and type of process that is due.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (articulating a three-factor balancing test for deciding what process is due).  The Court need not engage in this analysis, however, because it has already determined Plaintiff does not state a cognizable property or liberty interest which would give rise to a procedural due process claim.  As such, the Court will dismiss Plaintiff's claim for procedural due process violations.

---

[6]This is not to say, however, that Plaintiff lacks any claim for a violation of her freedom of association under the First Amendment.  The Court addresses this issue separately in Part III.E.  Rather, any freedom of association claim Plaintiff brings does not give rise to a liberty interest for procedural due process purposes, and hence Plaintiff cannot state a claim for a procedural due process deprivation.

11

## C. Equal Protection

Plaintiff claims her equal protection rights were violated when Defendants did not adhere to the state tenure process; did not evaluate Plaintiff as prescribed by Tennessee law; granted tenure to other teachers who had never been observed; and when Tommy Nipper wrote that Plaintiff "[d]oes not engage in dialogue with administrator respectfully" and did not include in his report the two prior, positive evaluations conducted by Cagle. Defendants respond that Plaintiff does not state an equal protection claim because she does not assert she is a member of a protected class, nor does she assert discriminatory intent by Nipper in not recommending Plaintiff for tenure.

The Fourteenth Amendment prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Intentional discrimination against a person or group of persons based on a suspect classification, such as race, must pass strict scrutiny, requiring the government to show the discrimination is a narrowly tailored means to a compelling end. *See, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). Strict scrutiny also applies when the government discriminates among similarly-situated persons as to exercise of a fundamental right. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982). On the other hand, the government may make distinctions on the basis of non-suspect classifications or non-fundamental rights if the distinctions meet rational-basis scrutiny: a rational relationship to a legitimate government purpose. *See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988). When a statute is facially neutral, a plaintiff must show there was discriminatory purpose in its application to make out an equal protection claim. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979).

Here, Plaintiff does not claim membership in a protected class. She does not claim she was discriminated against on the basis of race, and though she is a woman, she does not allege her

contract went unrenewed on the basis of gender. The only discrimination she claims is the School

Board's differentiating between her and some other teachers who, allegedly, received promotions

to tenured status without being evaluated first.

True, the School Board was making a distinction, grounded in Tennessee law, on the basis

of whether the teacher at issue was qualified to receive tenure or not. But one's status as a teacher

does not equate to membership in a protected class implicating strict scrutiny. And inasmuch as

public employment or engagement in the occupation of one's choosing is not a fundamental right,

*see, e.g.*, *Feeney*, 442 U.S. at 273, strict scrutiny is also not triggered. Under the rational-basis test,

then, Tennessee school boards certainly have a legitimate interest in retaining those teachers they

deem qualified for the classroom and releasing those deemed unqualified; and the non-renewal of

unqualified teachers' contracts is unquestionably a rational means to that end. To the extent Plaintiff

believes the School Board's decision deeming her unqualified for continued tenure was incorrect,

or that the School Board violated Tennessee law in promoting some teachers without evaluating

them, her proper redress is with the Tennessee legislature to open up the system of judicial review

to untenured teachers so she can bring precisely these challenges. But for purposes of her federal

equal protection argument, she states no cognizable claim on which this Court could recognize

discrimination against her, and the Court will not question the validity of a properly enacted

Tennessee law whose facial discrimination survives rational-basis scrutiny, and as to which Plaintiff

has alleged no discriminatory purpose in its application.

Theoretically, Plaintiff could be asserting a claim that she qualifies as a "class of one" under

equal protection analysis (though she does not explicitly state this theory in her complaint). Under

the class of one theory, a single plaintiff may state a claim for an equal protection violation when

the government has discriminated or acted arbitrarily against her. *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). The Supreme Court has narrowed *Olech*'s scope, however, by holding public employees cannot state an equal protection claim for class of one discrimination in connection with their employment. *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2148 (2008). Plaintiff here was a public employee during the entire time the conduct she complains of took place. Therefore, Plaintiff does not state a cognizable class of one equal protection claim in light of *Engquist*.[7]

For the foregoing reasons, Plaintiff does not state a plausible claim that her equal protection rights were violated. Accordingly, the Court will dismiss her equal protection claim.

### D. Fifth Amendment

In the memorandum supporting their motion to dismiss (Court File No. 15), Defendants argue Plaintiff's Fifth Amendment claims should be dismissed because she alleges no facts supporting a claim that her non-renewal arose from her constitutional protections against self-incrimination. Plaintiff counters that her "claim of a Fifth Amendment violation stems from a violation of due process" (Court File No. 17). Defendants apparently miss this response and again

---

[7]Defendants also argue (Court File No. 18) Plaintiff cannot claim a "selective prosecution" argument for her equal protection violation. Defendants cite *Futernick v. Sumpter Twp.*, 78 F.3d 1051 (6th Cir. 1996) for the elements of a selective prosecution claim and argues the rationale of *Engquist* should be extended to plaintiffs claiming selective prosecution in the public employment context. While Defendants may be attempting to cover all their bases, the Court views this argument as superfluous. Plaintiff has never raised a selective prosecution theory in her filings before the Court. Furthermore, *Futernick* is distinguishable because the selective prosecution there involved the plaintiff's claim he was "singled out" for selective enforcement of environmental regulations. 78 F.3d at 1056. "Usually, a claim of selective enforcement arises as a defense in a criminal prosecution or regulatory enforcement action." *Id.* The School Board in the instant case did not take a regulatory enforcement action against Plaintiff because there is no allegation she was engaged in illegal conduct; instead, it ostensibly followed Tennessee law in not renewing Plaintiff's teaching contract after her probationary period.

14

repeat their argument that Plaintiff alleges no facts implying she was ever forced to be a witness against herself (Court File No. 18).

Regarding Plaintiff's Fifth Amendment claim, the parties are like two ships passing in the night, because both are misconstruing the law. Simply put, Plaintiff does not mean to argue the Fifth Amendment's protection against self-incrimination applies to her, as Defendant says she does; rather, she is grounding her procedural due process and equal protection arguments in the text of the Fifth Amendment. However, Plaintiff cannot state a Fifth Amendment claim because she alleges Tennessee actors, not the federal government, deprived her of her rights. The guarantees of procedural due process and equal protection are applied to the individual states through the Fourteenth Amendment, not the Fifth. Accordingly, to the extent Plaintiff brings her claims under the Fifth Amendment, the Court will dismiss them because this is an improper Amendment in which to ground claims for state-initiated deprivations of constitutional rights.

### E. First Amendment

Plaintiff complains she was intimidated and threatened, and ultimately not retained for the 2007–2008 school year, in retaliation for her supporting the Young Republicans club, violating her First Amendment rights. Defendants counter that Plaintiff's mere agreement to serve as advisor to the club is not a First Amendment-protected activity, and that in advising the club, Plaintiff was only acting pursuant to her professional duties, a task which lacks First Amendment protection after *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

Plaintiff brings her First Amendment claims under 42 U.S.C. § 1983, which creates a cause of action for plaintiffs to vindicate alleged deprivations of constitutional rights. For liability under § 1983, a plaintiff must demonstrate (1) she was deprived of a right secured by the Constitution or

laws of the United States, and (2) the deprivation was caused by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Here, there is no dispute Defendants were acting under color of state law when Plaintiff was fired.

A § 1983 claim can be predicated upon a government official retaliating against an individual for exercising First Amendment rights. *Dean v. Byerley*, 354 F.3d 540, 551 (6th Cir. 2004) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394–95 (6th Cir. 1999) (en banc)). Public employees suing under a retaliation claim must demonstrate three elements:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). "If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence 'that it would have taken the same action even in the absence of the protected conduct.'" *Id.* (quoting *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999)).

When the plaintiff is a public employee, she must meet two additional requirements to demonstrate her conduct was protected—that is, to meet the first prong of the retaliation test. First, the employee must show her speech touched on matters of public concern. *Id.*; *see Connick v. Myers*, 461 U.S. 138, 146 (1983) ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices . . . ."). Second, the employee's interest "in commenting upon matters of public concern" must outweigh "the interest of the State, as an

16

employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *see also Garcetti*, 547 U.S. at 418 (making clear this two-step inquiry is required to evaluate the First Amendment claims of public employees).

### 1.    Protected Activity

Taking Plaintiff's factual allegations as true and construing them in the light most favorable to her, she alleges one event which could qualify as First Amendment-protected activity triggering Defendants' retaliation: her choice to act as sponsor of the high school's Young Republicans club, implicating her right of association. Defendants argue that because the school required each student club to have a faculty sponsor, Plaintiff was only fulfilling a professional duty in serving as the club's advisor, not affirmatively associating herself with the group.

Though the word "association" is not enumerated in the First Amendment, the Supreme Court has expressly held that the Amendment protects associational freedom. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). The Supreme Court "also has recognized that the right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Protected political beliefs and associations are not confined just to partisan associations, but to "political differences of any kind, not merely differences in party membership."

*Boger v. Wayne County*, 950 F.2d 316, 323 (6th Cir. 1991) (quoting *Williams v. City of River Rouge*, 909 F.2d 151, 153 n.4 (6th Cir. 1990)). Additionally, "no logical reason exists for distinguishing between speech and association in applying *Connick* to first amendment claims." *Id.* (quoting *Monks v. Marlinga*, 923 F.2d 423, 425 (6th Cir. 1991)).

### a.    Public Concern Analysis

Plaintiff must show her speech touched on matters of public concern. Such matters are those that relate to a "matter of political, social, or other concern to the community." *Jackson*, 168 F.3d at 910 (quoting *Connick*, 461 U.S. at 146). "To determine whether the speech involves a matter of public concern, we look to the content, form, and context of the statements in light of the record as a whole." *Id.* (citing *Connick*, 461 U.S. at 147–48). "Speech addressing matters of public concern encompasses 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 415 (6th Cir. 1994) (Keith, J., dissenting) (quoting *Connick*, 461 U.S. at 147). This inquiry necessarily avoids a bright-line rule, as what is a matter of public concern will vary depending on the interests, needs, and expressions of a given community. Recall, however, that under the standard for evaluating a motion under Fed. R. Civ. P. 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff, *Bloch*, 156 F.3d at 677, and decide whether Plaintiff is entitled to put forth evidence to support her claims, *Swierkiewicz*, 534 U.S. at 511. Plaintiff could submit evidence showing her association with the Young Republicans affected matters of public concern (because, for example, the club was addressing itself to social issues affecting the High School and its community), and the Court could conclude Plaintiff's association as advisor to the Young Republicans club touched upon matters of public concern, even if these are not understood

18

in a traditional, "political" sense.  *See Rotary Int'l*, 481 U.S. at 548 (holding that, though a club did

not take positions on "public questions," it engaged in service activities which also enjoyed First

Amendment protection).  The Court need not and does not decide this issue now, however, because

it finds the following analysis dispositive.

Defendants cite *Garcetti* to support their argument that Plaintiff was merely acting pursuant

to school requirements and was therefore not entitled to First Amendment protection for sponsoring

the Young Republicans club.  *Garcetti* held that "when public employees make statements pursuant

to their official duties, the employees are not speaking as citizens for First Amendment purposes, and

the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421.

The respondent in *Garcetti*, a deputy district attorney, had been disciplined for raising concerns in

a memo about the adequacy of an affidavit supporting a search warrant; he claimed he was subjected

to a series of retaliatory actions as a result.  *Id.* at 413–15.  These concerns were made pursuant to

his duties as a deputy district attorney in his office.  *Id.* at 421.  Plaintiff responds that her decision

to advise the Young Republicans was not a requirement of her official duties.  The club needed *a*

sponsor, but it did not necessarily have to be Plaintiff; Plaintiff was not employed to advise student

clubs, as the deputy district attorney was employed to write his critical memo, *id.*, but to teach.

Plaintiff argues because she made an affirmative choice, in addition to her teaching duties, to serve

as faculty sponsor for the Young Republicans, she volitionally associated herself with the group and

its message, triggering her right to freedom of association under the First Amendment.

Plaintiff cannot prevail under the application of *Garcetti*, however, because advising student

groups must be a part of teachers' official duties at the High School.  After all, all student clubs

required a faculty member to sponsor them so they could gain official recognition by the school

19

(Compl. ¶ 15). This must mean, conversely, that the High School had an expectation its teachers would advise student clubs if those clubs wished to be approved (though it may not have required a specific teacher to advise a specific club). That is, any role Plaintiff played for the Young Republicans as that club's faculty advisor would have fallen within the scope of duties normally expected of all faculty members at the High School. Thus, while Plaintiff's serving as advisor to the club may have implicated her First Amendment right to freedom of association, and issues of public concern may even have been involved, the fact she was doing so pursuant to her official duties, in view of *Garcetti*, prevents a conclusion she was engaged in protected activity under the foregoing public concern analysis.

### b. Limited Public Forum Analysis

An alternative route remains open to Plaintiff, however, to show she was engaged in constitutionally protected activity. The High School may have created a limited public forum by giving sanction to student groups with diverse views. If so, the High School and its officials would not be permitted to discriminate, based on viewpoint, as to what groups could and could not gain official recognition.

A limited public forum consists of nontraditional public spaces[8] which the government intentionally opens for certain types of public discourse or as a channel of communication. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 475 U.S. 788, 802 (1985). "The necessities of

_____

[8]Traditional public forums are limited to those spaces which have "immemorially . . . time out of mind been held in the public trust and used for purposes of expressive activity." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680 (1992) (internal quotation marks omitted). Such spaces generally include public parks, streets, and sidewalks, but the Supreme Court has resisted expanding the definition of what constitutes a traditional public forum beyond these paradigmatic examples. *See id.* at 679.

20

confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citing *Cornelius*, 473 U.S. at 806). "Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Id.* (internal citations and quotation omitted). Axiomatic to First Amendment jurisprudence is that viewpoint-based discrimination, based on the particular views a speaker takes on a subject, is an "egregious form of content discrimination" and the government must not regulate speech where the ideology or opinion of the speaker is the only justification for the restriction. *Id.* (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

In *Rosenberger*, a university denied funding to a student newspaper with a Christian editorial viewpoint, fearing financial support of the newspaper could be construed as an Establishment Clause violation. However, the university withheld funds not just from this newspaper, but from any publications that "primarily promote[d] or manifest[ed] a particular belief in or about a deity or an ultimate reality." *Id.* at 836. This amounted to impermissible viewpoint discrimination, concluded the Supreme Court, because it excluded from access to funding those who advocated *any* point of view concerning religion, whether it was sectarian, agnostic, or atheistic. In other words, the university could not, effectively, tell students that the only permissible viewpoint for student organizations was a non-religious viewpoint. *Id.* at 831. And in *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), a school denied access to a church which wanted to show a film series addressing child-rearing questions from a "Christian perspective." The Supreme

21

Case 1:08-cv-00056-CLC-WBC   Document 19   Filed 11/18/08   Page 21 of 24   PageID #: 130

confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citing *Cornelius*, 473 U.S. at 806). "Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Id.* (internal citations and quotation omitted). Axiomatic to First Amendment jurisprudence is that viewpoint-based discrimination, based on the particular views a speaker takes on a subject, is an "egregious form of content discrimination" and the government must not regulate speech where the ideology or opinion of the speaker is the only justification for the restriction. *Id.* (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

In *Rosenberger*, a university denied funding to a student newspaper with a Christian editorial viewpoint, fearing financial support of the newspaper could be construed as an Establishment Clause violation. However, the university withheld funds not just from this newspaper, but from any publications that "primarily promote[d] or manifest[ed] a particular belief in or about a deity or an ultimate reality." *Id.* at 836. This amounted to impermissible viewpoint discrimination, concluded the Supreme Court, because it excluded from access to funding those who advocated *any* point of view concerning religion, whether it was sectarian, agnostic, or atheistic. In other words, the university could not, effectively, tell students that the only permissible viewpoint for student organizations was a non-religious viewpoint. *Id.* at 831. And in *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), a school denied access to a church which wanted to show a film series addressing child-rearing questions from a "Christian perspective." The Supreme

21

Case 1:08-cv-00056-CLC-WBC   Document 19   Filed 11/18/08   Page 21 of 24   PageID #: 130

Court held the school had previously opened its property to use by other community groups for "social, civic, and recreational" purposes, thereby creating a limited public forum. *Id.* at 391–92. Denying the church the ability to show its film, the subject of which was effectively indistinguishable from the "social or civil purposes" otherwise permitted by the school, constituted viewpoint discrimination because it was a denial based solely on the religious perspective which informed the film's production. *Id.* at 393–94.

Plaintiff's complaint indicates several clubs exist at the High School (Compl. ¶ 15). The High School may officially recognize theater, debate, performing arts, and other similar student organizations, and it may allow religious or community groups access to its facilities after the school day has concluded. Given these organizations' existence, then, the High School created a limited public forum when it made it possible for student organizations to carry on their activities with the sponsorship of a faculty member, including any viewpoints attendant to those groups' respective purposes.

By allegedly telling Plaintiff "there will be no Republican politics in this school," Nipper impermissibly discriminated against Plaintiff's association with the Young Republicans club on the basis of its political viewpoint. Other clubs existed at the High School, but it does not appear Nipper prohibited teachers from sponsoring those groups. Rather, he appears to have prohibited Plaintiff from acting as faculty advisor to the Young Republicans because he did not like the club's politics. This type of viewpoint discrimination is anathema to the values protected by the First Amendment, and targeting views taken by speakers on particular subjects makes any First Amendment violation "all the more blatant." *Rosenberger*, 515 U.S. at 829. Therefore, Plaintiff was engaging in protected activity by associating herself with a group in a limited public forum of the High School's creation,

satisfying the first prong of the retaliation test enunciated in *Leary*.

### 2.    Chilling Effect from Adverse Action

Defendants do not dispute that the nonrenewal of Plaintiff's teaching contract would be a sufficient chilling effect for a retaliatory action under the First Amendment. *See Leary*, 228 F.3d at 738; *see also Haimowitz v. Univ. of Nevada*, 579 F.2d 526, 529–30 (9th Cir. 1978) (failing to renew the contract of a non-tenured teacher still on probationary status constituted a sufficiently retaliatory act).

### 3.    Motivating Factor

The third element of a retaliation claim is that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. Defendant does not contest the causation element in its filings before this Court (Court File Nos. 14–15). Accordingly, at this stage in the action, the Court will assume the causation element is satisfied.

However, the Court notes that nowhere in Plaintiff's complaint does she allege Defendants Boynton, Linda Nipper, or Cagle had anything to do with the denial of her First Amendment rights. Rather, she only alleges Tommy Nipper's statement to her concerning the Young Republicans club, and that her desire to sponsor the club was reported to McDaniel, who subsequently wrote the letter not renewing her contract for the 2007–2008 year. Because Boynton, Linda Nipper, and Cagle were not involved in Plaintiff's First Amendment claim, and this claim is the only one which survives Defendant's motion to dismiss, the Court will dismiss these three Defendants from the suit.

Otherwise, because Plaintiff has pleaded the three elements required for a claim of retaliation in violation of the First Amendment, she has adequately stated this claim, and the court will deny Defendants' motion to dismiss it.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion to dismiss regarding Plaintiff's procedural due process, equal protection, and Fifth Amendment claims, and will **DISMISS** those claims.  The Court will **DENY** Defendants' motion to dismiss as to Plaintiff's First Amendment claim, and that claim will remain.  The Court will **DISMISS** Defendants Suzanne Boynton, Linda Nipper, and Rhonda Cagle.

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**